UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN THE MATTER OF: BERTUCCI
CONTRACTING CO., L.L.C.

CIVIL ACTION

NO. 12-664 C/W 12-
697 C/W 12-1783
C/W 12-1912 C/W
12-1914
REF: ALL CASES

SECTION "J" (3)

ORDER

On March 19, 2014, Petitioners in Limitation's Motion to Compel [Doc. #272] came on for oral hearing before the undersigned.  Present were Michael Stag and Ashley Liuzza on behalf of claimants, and Michael Chernekoff and Etienne Balart on behalf of various petitioners-in-limitation. After the oral hearing, the Court took the motion under advisement.  Having reviewed the pleadings and the case law, the Court rules as follows.

I.      **Background**

The complaint alleges as follows.  The original Interstate 10 Twin Span Bridges ("Twin Spans") crossed Lake Pontchartrain and connected the Lake's southern and northern shores. In 2005, Hurricane Katrina made landfall in southeast Louisiana and severely damaged the Twin Spans. The Louisiana Department of Transportation and Development initially was tasked with repairing the

Twin Spans. Because of the extensive damage caused by Hurricane Katrina, the State of Louisiana ultimately decided that the Twin Spans were too vulnerable to storm surges and decided to replace them with two new bridges. Work on the replacement bridges began on July 13, 2006. The first bridge opened on July 9, 2009, and the second on April 7, 2010. The Twin Spans then were permanently closed to traffic.

The State of Louisiana contracted with various companies to effectuate the demolition and removal of the Twin Spans and the repurposing of the associated concrete. This process began in May 2011, and was expected to generate in excess of 244,000 tons of concrete from the Twin Spans. As part of the Twin Spans' demolition and removal, barges and tugboats transported slabs of concrete to a "staging area" just north of Lake Pontchartrain. The staging area was located on an undeveloped piece of property accessible from the Lake via a canal. Vessels carried concrete through the canal. On their way they passed the Lakeshore Estates Subdivision and other residential areas ("Lakeshore Estates"), which were adjacent to the staging area. In so doing, the vessels allegedly trespassed on part of the canal purportedly owned by residents of the Lakeshore Estates. The currents from those vessels also allegedly eroded and caused damage to boathouses and bulkheads owned by residents of Lakeshore Estates.

According to testimony adduced in the state court and to depositions filed as a part of a motion for reconsideration, once the concrete arrived at the staging area, the tugboats rammed the barges onto shore and kept them there by revving their engines anywhere from 30 minutes to several hours. While tugboats held the barges in place, large slabs of concrete were unloaded to shore. This process entailed dragging the concrete off the metal barges or picking up the concrete by crane and dropping it back on the barges to break it into smaller pieces. After the concrete was unloaded,

2

industrial crushers and grinders broke it down or crushed it into smaller parts and sorted it by size. This again involved picking up slabs of concrete and repeatedly smashing them until they were reduced to the desired size. Once empty, the barges would be cleaned. This involved pushing any remaining debris from the barges into the water. This debris also allegedly entered part of the Lakeshore Estates.

After being transported from the Twin Spans, unloaded and crushed down, some of the concrete was packed into geo-textile "mattresses." These mattresses initially were stored at the staging area, but later were loaded back onto the barges and transported to Lake Borgne to be used for shoreline protection. Other concrete from the staging area was used in the creation of an artificial reef and construction of a fishing pier.

Aside from allegedly being very loud, the entire process purportedly also created dust at the point at which the concrete was unloaded and when the concrete was crushed, which then settled on the Lakeshore Estates. The activities at the staging area also allegedly created vibrations that disturbed and damaged the Lakeshore Estates.

The State contracted with Petitioners-Appellants NASDI, L.L.C. ("NASDI"), and Bertucci Contracting Co., L.L.C. ("Bertucci") (collectively, "Shipowners"), to help complete the process of demolishing and removing the Twin Spans and repurposing the concrete remains. The Louisiana Department of Transportation and Development contracted with NASDI to demolish and remove parts of the Twin Spans and transport them to the staging area. Bertucci entered a contract with the Louisiana Office of Coastal Protection and Restoration to break up the concrete, place it into mattresses, and transport the mattresses to Lake Borgne. Bertucci also regularly transported light and heavy equipment to the staging area by boat and barge. NASDI sub-contracted with Bertucci

to assist in breaking down the concrete at the staging area.

Claimants are residents of the Lakeshore Estates. On January 17, 2012, they filed a Petition for Declaratory Judgment, Injunctive Relief, and Class Action Lawsuit Related to Liability and Damages in the Civil District Court for the Parish of Orleans. Their petition asserted that the Shipowners' activities created noise, dust, and vibrations that resulted in personal injury, property damage, and nuisance to nearby residential areas. They further alleged that the Shipowners' vessels trespassed into private waterways near the staging area that caused further damage.

On March 9, 2012, Bertucci filed a limitation of liability action in this Court pursuant to the Limitation of Liability Act ("Limitation Act"), 46 U.S.C. §§ 30501 *et seq.* The District Court enjoined claimants from prosecuting their state-court action and consolidated all of the limitation actions.

On March 18, 2012, claimants filed an Emergency Motion to Limit Stay, Lift Stay, and/or Set Preliminary Injunction Hearing. They sought to modify or limit the District Court's stay to obtain pending injunctive relief in state court. The District Court held a status conference on March 19, 2012 and denied claimants' motion without prejudice to their right to bring their motion again at a later date.

On March 26, 2012, claimants moved to dismiss the Shipowners' limitation actions for lack of subject matter jurisdiction and/or to lift the stay. The District Court granted their motions in part and denied them in part. The District Court first construed the state-court petition to include separate "land-based" and "vessel-based" claims. It then ruled that admiralty jurisdiction did not attach to what it termed the land-based claims, "i.e., the noise, dust, and vibrations allegedly emanating from the concrete breaking operation at the staging area." The Court also (1) declined to exercise

supplemental jurisdiction over what it deemed the land-based claims; and (2) held that admiralty jurisdiction attached to vessel-based claims for trespass by barges and tugboats traveling on claimants' side of the canal.  In a separate order, the Court lifted the injunction as to the land-based claims.  NASDI filed a motion for reconsideration, which the District Court summarily denied. Shipowners timely filed an interlocutory appeal of the District Court's dismissal of their nuisance-related limitation actions for lack of subject matter jurisdiction, and the court's lifting of its stay as to those claims. The Fifth Circuit vacated the District Court's order and remanded the lawsuit to this Court for further proceedings.

## II.   The Parties' Contentions

### A.      The Motion to Compel

Several community meetings took place to oppose the operations that are the subject of this litigation.  Attorneys from Smith Stag attended some of the meetings.  Citing two specific meetings, petitioners-in-limitation ("PIL") note that no attorneys were present at the meeting at Stone's Bistro. PIL also note that Smith Stag attorneys attended the meeting at Phil's Marina Cafe but that not all residents had retained counsel at the time, some never retained counsel or joined this lawsuit, not all residents attended the meeting to seek legal advice, and none of the residents provided confidential information to the attorneys.  Despite this, counsel for claimants have instructed them not to respond to questions at depositions about these meetings on the ground of attorney-client and/or work-product privilege.  PIL seek information as to when the meetings took place, the attendees, the dates the attendees formally retained counsel, the content of the meetings and any document distributed at the meetings.

PIL contend that there was no attorney-client relationship at the time of the meetings.

Claimants have failed to produce their retainer agreements, nor have they listed them on a privilege log, but PIL argue that counsel did not represent claimants at the time of the meetings.  Indeed, PIL note that some attendees never even became a client of Smith Stag. Citing deposition testimony, PIL also note that numerous claimants did not attend the meetings to seek legal advice.

Noting that the attorney-client privilege protects only those communications by a client to a lawyer and communications by a lawyer that would disclose the client's confidential information, PIL argue that no claimant conveyed information to counsel at the meetings.  Only counsel conveyed information to solicit business.  Richard Haaker, counsel for claimants' expert, attended the meeting and conveyed information, and, PIL maintain, he is not an attorney.  PIL note that most of the questions at the meetings concerned his findings.

PIL also contend that there was no expectation of privacy at the meetings given that they were held in public locations with no means to determine who was attending.  PIL note that many attendees present at the meetings never became clients of Smith Stag.  The presence of these third parties, PIL argue, waives the privilege.

Citing a plethora of case law, PIL contend that solicitation meetings and documents handed out at solicitation meetings are not protected by either privilege.

PIL also note that counsel for claimants sent an Expert Summary Document to them that has led many of them to fear for their current and future health and forms the basis of their remediation and property-diminution claims.  PIL believe that this document is a summary of counsel for claimants' expert's findings.  PIL seek the document and have attempted to question claimants as to it, but counsel has instructed them not to respond on the ground of privilege.  The document is not identified on claimants' privilege log.

6

PIL argue that the document is not protected by the privileges because it did not contain legal advice.  Citing deposition testimony, PIL contend that the document contained only the test results of counsel's experts.  PIL further maintain that the document is subject to production because counsel used it to refresh the recollection of numerous claimants before their depositions. Even if the work-product doctrine protects the document, PIL argue that it has substantial need for the document and no other means to obtain it.  PIL contend that the document is the principal basis of claimants' claims for remediation and property diminution.

Lastly, PIL seek their attorneys' fees and costs incurred in the filing of the motion.

**B.      Claimants' Opposition**

Claimants contend that they have not withheld information regarding the meeting at Stone's Bistro.  Claimants maintain that PIL have had the flyer advertising the meeting, the sign-in sheet and related e-mails since August 2012.

Claimants argue that the purpose of the December 2011 meeting at Phil's Marina Cafe was to offer legal advice to a group of concerned citizens.  Claimants note that even the e-mail sent by Shirley Wagner to affected neighbors stated that the meeting was "to discuss your rights under State and Federal law."  Smith Stag did not advertise the meeting and appeared at the request of clients. Citing deposition testimony, claimants contend that they attended the meeting for legal advice, even though those exact words were not used.

Claimants maintain that the law does not require that parties actually be represented or that they ever retain counsel for a communication to be privileged.  With regard to those attendees who never retained counsel, claimants argue that as residents of the affected areas, they share a common legal interest with claimants and are also members of the putative class in the litigation pending in

7

state court.  Thus, claimants contend, that attendees failed to pursue litigation in this Court is of no moment.

The second meeting at Phil's was in April 2012.  Smith Stag sent invitations to this meeting to clients only.  Communications at this meeting related to the pending class action in state court and other legal issues.  Claimants argue that PIL's reliance on testimony that non-clients and/or non-claimants attended the meeting address the 2011 – and not the 2012 – meeting at Phil's.  Claimants maintain that Smith Stag held this meeting before the dissemination of any advertisement.

Claimants note that Smith Stag provided the Expert Summary Document to their clients regarding the status of the lawsuit and regarding expert opinions in this lawsuit.  This was nothing more than a portion of correspondence sent to clients to serve their legal interests in this case.  Claimants maintain that the attorney-client privilege protects the document and argue that the document contains legal advice, and there has been no waiver of the privilege.

Claimants also contend that the work-product doctrine protects the document from disclosure.  Counsel drafted the document, and disclosure would reveal trial strategy and counsel's mental impressions.  Counsel outlines the steps that she took in drafting the letter segment of the document.  Counsel contends that she mentally impressed upon the document her analysis of her conversation with  claimants' experts and their reports.  She also appraised the conversations with the experts and compiled them in a manner consistent with her trial strategy.

Claimants contend that PIL can not demonstrate undue hardship in obtaining the material from other sources.  Claimants note that information regarding the health concerns posed by the project was presented to the public through media reports, conversations among neighbors and other means.  Citing deposition testimony, claimants argue that they were aware of the potential health

concerns long before counsel disseminated the reports to them.

Citing the Advisory Committee Notes to Federal Rule of Evidence 612, claimants note that the Committee intended that nothing in the rule be construed as barring the assertion of a privilege with respect to writings used by a witness to refresh his memory. Citing case law, claimants contend that the party seeking to compel disclosure under this rule must demonstrate why disclosure would be necessary and in the interests of justice. Claimants note that the deponents did not testify that the document was used to refresh their memory.

Lastly, claimants argue that attorneys' fees and costs are not warranted here given that their assertion of the privilege was reasonable.

## C.      The Reply of Petitioners-in-Limitation

PIL reply that at the meetings, non-lawyers made statements, people attended without knowledge that attorneys would be present, people attended to obtain information and not legal advice from Smith Stag, and people attended who were not clients of Smith Stag and who never became clients. They contend that there still exists a great deal of uncertainty regarding the various meetings given the inability of claimants to remember much at their depositions. PIL also maintains that no precautions were taken to exclude people from the meetings that, they note, occurred in public settings.

Citing case law, PIL argue that the common legal interest doctrine does not apply to plaintiffs in this circuit. And even if it did, PIL note that at least one deponent – who is an adversary to claimants – sent three people to the meeting who never had the intention of seeking legal advice.

## III.    Law and Analysis

The federal common law of privilege applies in this case brought under the court's federal

question jurisdiction. *Willy v. Admin. Review Bd.*, 423 F.3d 483, 495 (5th Cir. 2005).  The attorney-client privilege protects communications by a client to his lawyer and communications from the lawyer if they would tend to disclose the client's confidential communications.  *See Hodges, Grant & Kaufman v. United States*, 768 F.2d 719, 720–21 (5th Cir. 1985)  ("attorney-client privilege protects communications made in confidence by a client to his lawyer for the purpose of obtaining legal advice. The privilege also protects communications from the lawyer to his client, at least if they would tend to disclose the client's confidential communications.") (citations omitted).  It is axiomatic that the attorney-client privilege "only protects disclosure of confidential communications between the client and attorney; it does not protect disclosure of underlying facts." *United States v. Edwards*, 39 F. Supp. 2d 716, 723 (M.D. La. 1999) (citing *Upjohn Co. v. United States*, 449 U.S. 383, 395-96 (1981); *In re Six Grand Jury Witnesses*, 979 F.2d 939 (2d Cir. 1992); *United States v. Freeman*, 619 F.2d 1112 (5th Cir. 1980); *Computer Network Corp. v. Spohler*, 95 F.R.D. 500 (D.D.C. 1982)).

The burden of sustaining a claim of attorney-client privilege falls on the party asserting the privilege. *Exxon Corp. v. St. Paul Fire & Marine Ins.*, 903 F. Supp. 1007, 1008 (E.D. La. 1995); *High Tech Commc'ns, Inc. v. Panasonic Co.*, No. 94-1477, 1995 WL 45847, at *1 (E.D. La. Feb.2, 1995) (citing *Hodges*, 768 F.2d at 721) (additional citations omitted). "Although the privilege belongs to the client, and only the client may waive it, an attorney may assert the privilege on the client's behalf." *Haines v. Liggett Grp.*, 975 F.2d 81, 90 (3d Cir. 1992) (citing McCormick on Evidence § 92 (4th ed.1992)); *accord United States v. Juarez*, 573 F.2d 267, 276 (5th Cir. 1978) (citing *Fisher v. United States*, 425 U.S. 391, 402 n.8 (1976)).

Once a claim of privilege has been established, the burden of proof shifts to the party seeking

the privileged communication to prove any applicable exception to the privilege, such as waiver. *Perkins v. Gregg County*, 891 F. Supp. 361, 363 (E.D. Tex. 1997); *Texaco, Inc. v. La. Land & Expl.*, Inc., 805 F. Supp. 385, 387 (M.D. La. 1992).

"Patently, a voluntary disclosure of information which is inconsistent with the confidential nature of the attorney[-]client relationship waives the privilege." *Alldread v. City of Grenada*, 988 F.2d 1425, 1434 (5th Cir. 1993).

> The privilege is waived by the attendance of a third person to the communication or by the sharing of the communication with a third person, if that person does not share a common legal interest with respect to the subject matter of the communication. In some circumstances, the existence of a matter of common interest must be presumed in the pre-representation phase when several persons seek consultation with an attorney; and in that situation no one of the jointly interviewed clients can waive the privilege as to all participants.

*Herwig v. Marine Shale Processors, Inc.*, No. 92-2753, 1993 WL 70223, *1 (E.D. La. Mar. 9, 1993); *accord In re Auclair*, 961 F.2d 65, 69 (5th Cir. 1992) (citing *Hodges, Grant & Kaufman*, 768 F.2d at 721; McCormick on Evidence § 91 at 219 (3d ed. 1984)).

Work product protection from discovery extends to "documents and tangible things that are prepared in anticipation of litigation or for trial by or for [a] party or its representative (including the . . . party's attorney . . . or agent)," Fed. R. Civ. P. 26(b)(3)(A), but does not extend to the "underlying relevant facts." *Blockbuster Entm't Corp. v. McComb Video, Inc.*, 145 F.R.D. 402, 403 (M.D. La. 1992) (citing *United States v. El Paso Co.*, 682 F.2d 530, 542 (5th Cir. 1982); *Hill Tower, Inc. v. Dep't of Navy*, 718 F. Supp. 562, 566 (N.D. Tex. 1988)); *accord* 8 C.A. Wright, A.R. Miller & R.L. Marcus, Federal Practice & Procedure § 2024, at 494 (3d ed. 2010).

The work product "privilege can apply where litigation is not imminent, as long as the primary motivating purpose behind the creation of the document was to aid in possible future

litigation." *Udoewa v. Plus4 Credit Union*, 457 F. App'x 391, 393 (5th Cir. 2012) (quoting *In re Kaiser Alum. & Chem. Co.*, 214 F.3d 586, 593 (5th Cir. 2000)) (internal quotation omitted).

"The mere fact that a document is prepared when litigation is foreseeable does not mean the document was prepared in anticipation of litigation. . . ." *Arkwright Mut. Ins. Co. v. Nat'l Union Fire Ins. Co.*, 19 F.3d 1432, 1994 WL 58999, at *3 (6th Cir. 1994) (citing *Nat'l Union Fire Ins. Co. v. Murray Sheet Metal Co.*, 967 F.2d 980, 984 (4th Cir. 1992)). Even "[e]stablishing that a document was prepared after litigation was commenced is insufficient to prove that the document was prepared in anticipation of litigation. . . . What is crucial is that 'the primary motivating purpose behind the creation of the document was to aid in possible future litigation.'" *Robinson v. Tex. Auto. Dealers Ass'n*, 214 F.R.D. 432, 449 (E.D. Tex. 2003) (quoting *In re Kaiser Alum.*, 214 F.3d at 593, *rev'd on other grounds*, 2003 WL 21911333 (5th Cir. July 25, 2003); *accord Global Oil Tools, Inc. v. Barnhill*, No. 12-1507, 2013 WL 1344622, at *6 (E.D. La. Apr. 3, 2013); *Guzzino v. Felterman*, 174 F.R.D. 59, 63 (W.D. La. 1997); *Blockbuster*, 145 F.R.D. at 404.

In addition, "[t]he law is settled that 'excluded from the work product doctrine are materials assembled in the ordinary course of business, or pursuant to public requirements unrelated to litigation.'" *Guzzino*, 174 F.R.D. at 62 (quoting *United States v. El Paso Co.*, 682 F.3d 530, 542 (5th Cir. 1982) (citing Fed. R. Civ. P. 26(b)(3) advisory committee notes)); *accord* 8 C.A. Wright, A.R. Miller & R.L. Marcus, Federal Practice & Procedure § 2024, at 503 (3d ed. 2010); *see also Hill Tower, Inc.*, 718 F. Supp. at 565 ("The mere fact this report deals with facts, opinions, and recommendations that later may be the focus of litigation does not establish that there was the expectation of litigation when this document was drafted.") (citing *Senate of P.R. v. U.S. Dep't of Justice*, 823 F.2d 574, 586 (D.C. Cir. 1987); *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d

854, 865 (D.C. Cir. 1980)).

Thus, "[i]f the document would have been created regardless of whether the litigation was also expected to ensue, the document is deemed to be created in the ordinary course of business and not in anticipation of litigation." *Global Oil Tools*, 2013 WL 1344622, at *6 (citing *S. Scrap Mat'l Co. v. Fleming*, No. Civ. A. 01-2554, 2003 WL 21474516, at *6 (E.D. La. June 18, 2003); *Piatkowski v. Abdon Callais Offshore, L.L.C.*, No. 99-3759, 2000 WL 1145825, at * 1 (E.D. La. Aug, 11, 2000)).

Opinion or core work product merits special protection from discovery pursuant to Rule 26(b)(3)(B). "At its core, the work-product doctrine shelters the mental processes of the attorney [or others named in the Rule], providing a privileged area within which he can analyze and prepare his client's case." *United States v. Nobles*, 422 U.S. 225, 238-39 (1975).

Nonetheless, when a party is ordered to produce its work product because the discovering party has made the showing mandated by Rule 26(b)(3)(A)(i) and (ii), Rule 26(b)(3)(B) requires the court to "protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of a party's attorney or other representative concerning the litigation." Thus, tangible materials that contain the mental impressions, conclusions, opinions or legal theories of a party's attorney or representative, otherwise known as "opinion work product," are afforded a high degree of protection. *In re Katrina Canal Breaches Consol. Litig.*, No. 05-4182, 2010 WL 2522968, at *1 (E.D. La. June 14, 2010) (additional quotation omitted) (citing *Upjohn Co. v. United States*, 449 U.S. 383, 395-96 (1981)); *Dunn v. State Farm Fire & Cas. Co.*, 927 F.2d 869, 875 (5th Cir. 1991); *Int'l Sys. & Controls Corp. Sec. Litig.*, 693 F.2d at 1240; *Bonneau v. F & S Marine, Inc.*, No. 09-3336, 2010 WL 1254552, at *2 (E.D. La. Mar. 25, 2010); *Bross v. Chevron U.S.A. Inc.*, No.

13

06–1523, 2009 WL 854446, at *5 (W.D. La. Mar. 25, 2009); *Blockbuster*, 145 F.R.D. at 403-04) (additional citations omitted).

With regard to the meetings, the Court first notes that claimants do not assert any privilege with regard to the meeting at Stone's Bistro.  Information as to that meeting is thus fully discoverable.  And the Court also finds that when the meetings took place, the attendees, and the dates on which the attendees formally retained counsel are underlying facts that are completely discoverable.  Claimants shall produce this information to PIL if they have not already done so.  The contents of the meetings and any documents distributed at the December 2011 and April 2012 meetings at Phil's Marina Cafe is another matter with which this Court has struggled greatly.

The evidence reveals that attorneys from Smith Stag attended the 2011 meeting at Phil's Marina Cafe at the request of clients.  The e-mail sent by Shirley Wagner to affected neighbors informed them that the meeting was "to discuss [their] rights under State and Federal law."  And Smith Stag sent invitations to the 2012 meeting to clients only.  At the oral hearing, counsel informed the Court that Phil's Marina Cafe was closed to all but clients and potential clients.  The Court can only find from this evidence that the affected neighbors attended the two meetings as clients and/or potential clients and for the purpose of seeking legal advice related to their rights under state and federal law.  And simply because a non-attorney, counsel for claimants' expert, spoke at the meeting does not shatter the application of the privilege.  It is well-established law that the work-product privilege applies to a representative of a party and not just its counsel.  Fed. R. Civ. P. (b)(3)(A).

That not all of the attendees became clients of Smith Stag is of no moment.  "The test for determining whether an attorney-client relationship exists is a subjective one and hinges on the

client's belief that he or she is consulting the lawyer in his professional capacity with the intention of seeking professional legal advice." *United States v. Edwards*, 39 F. Supp. 2d 716, 722 (M.D. La. 1999).  Because the Court has found that the meetings were scheduled to provide legal advice to the attendees, that is enough to invoke the privilege here.   Accordingly, under these factual circumstances, the Court can not find that waiver occurred.

Moreover, the Court finds inapposite the case law on which PIL rely with regard to solicitation meetings.  Three of the cases addressed solicitation letters, even form letters, and not meetings.  *See EEOC v. CRST Van Expedited, Inc.*, No. C07-0095, 2009 WL 136025, *4 (N.D. Iowa Jan. 20, 2009); *Hood v. Cent. United Life Ins. Co.*, No. 2:07-CV-00164, 2008 WL 2593787, *1 (N.D. Miss. June 27, 2008); *Auscape Int' v. Nat'l Geographic Soc'y*, No. 92 CIV. 6441, 2002 WL 31250727, *1 (S.D.N.Y. Oct. 8, 2002).  And the *Morisky* court noted that the solicitation meeting there was open to the general public.  *See Morisky v. Pub. Serv. Elec. & Gas Co.*, 191 F.R.D. 419, 423-24 (D.N.J. 2000).  That is not the case here as the meetings were restricted to claimants and potential claimants.

Lastly, the Court has no trouble finding that the Expert Summary Report is protected from disclosure by the work-product privilege.  At the oral hearing, claimants produced the document to the Court for *in camera* review.  The Court's review of the document reveals that disclosure would reveal counsel's mental impressions and opinions.  And neither has PIL demonstrated the undue hardship necessary to require disclosure of the document.  As noted, PIL argue that claimants base their health, remediation and property-diminution claims on the document.  But that is information that PIL can obtain through their own experts and the ordinary course of discovery without the necessity of seeing the Expert Summary Document.

**IV.    Conclusion**

For the foregoing reasons,

**IT IS ORDERED** that the Petitioners in Limitation's Motion to Compel [Doc. #272] is

GRANTED IN PART and DENIED IN PART as outlined above.  The Court further denies all

requests for fees and costs.

New Orleans, Louisiana, this 27th day of May, 2014.

**DANIEL E. KNOWLES, III**
**UNITED STATES MAGISTRATE JUDGE**